| Albanese v State of New York |
|:---:|
| 2024 NY Slip Op 30889(U) |
| February 23, 2024 |
| Court of Claims |
| Docket Number: Claim No. 126866 |
| Judge: Linda K. Mejias-Glover |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

FILED

MAR 20 2024

STATE COURT OF CLAIMS
ALBANY, N.Y.

STATE OF NEW YORK          COURT OF CLAIMS

RENATO ALBANESE,

Claimant,

DECISION

-v-

STATE OF NEW YORK,          Claim No.   126866

Defendant.

BEFORE:          HON. LINDA K. MEJIAS-GLOVER
                 Judge of the Court of Claims

APPEARANCES:     For Claimant:
                 ANDREW F. PLASSE & ASSOCIATES, LLP.
                 By:    Andrew F. Plasse, Esq.

                 For Defendant:
                 LETITIA JAMES, ATTORNEY GENERAL
                 By:    Elaine Driscoll, Esq.
                        Assistant Attorney General

A trial on the sole issue of liability was conducted before this Court on February 7, 8 and 9, 2023, via Microsoft Teams, upon the consent of all parties and counsel. Claimant called two witnesses to testify, and the Defendant called three witnesses to testify.

The Claim alleges, on or about October 14, 2014, at approximately 1:30 pm, at Sing Sing Correctional Facility (hereinafter, "Sing Sing CF") Correction Officer Antonio Ocasio (hereinafter, "Officer Ocasio") advised Claimant to put his hands on the wall. Claimant a complied, however Officer Ocasio hit him in the right side of his head and pushed him to the ground. Thereafter, Officer Lassiter joined in, kicking and punching Claimant, and put his knees and body weight into Claimant's lower back. The Claim further alleges that Claimant sustained serious injuries as a result, and he was placed into the Special Housing Unit ("SHU"). Defendant, the State

[* 1]

of New York, denies all allegations of negligence and asserts that the Claimant's own actions caused his injuries.

The following exhibits were entered into evidence at the time of trial: Claimant's Exhibits 1, 2, 4 and 5, and Defendant's Exhibits A, C, D, E, and F.

RELEVANT TESTIMONY

*Claimant Renato Albanese*

At the time of trial Claimant testified from Batavia Federal Detention Center (T1[1]. 17-18). Mr. Albanese testified that on the day of the incident, October 14, 2014, Claimant was an incarcerated person housed at Sing Sing CF, specifically in the B block on Victory Gallery (*Id.*). He described the B block as a housing gallery located in the southeast corner, housing approximately 64 to 68 incarcerated persons (T1. 19). Claimant testified that at approximately 1:00pm he was taken to the infirmary, located at the 710 gate, to take his daily medication (T1 21, 27). Claimant testified that he was taking "psychotic medication", and pain medication for his lower back. He testified that he would go to the infirmary three times a day to take those medications (T1. 21-22). Claimant testified that he has a prior existing injury to his right hand from an accident he had prior to his incarceration, but which required surgery while incarcerated at Sing Sing CF. As a result of the surgery, he incurred fifty stitches in his right hand, and received physical therapy thereafter (T1. 22-24).

Claimant testified that to attend commissary, the protocol was that after taking his afternoon medication, he would ask the officer at the door if he could go to commissary, the officer would let him out of the door, and he would make a right and proceed to commissary (T1. 28). He testified that on the day of the incident, he had an interaction with Officer Ocasio about going to

---

[1] "T1." shall refer to Trial Transcript Page of February 7, 2023, trial date.

[* 2]

commissary. Claimant further testified that this was his first interaction with Officer Ocasio (T1. 29).

Claimant testified that thereafter, Officer Ocasio was cursing at him, instructed him to get up against the wall, and began kicking his legs (T1. 30). Claimant went on to testify that Officer Ocasio started taking things out of Claimant's pockets and began punching him on the side of his head (*Id.*). Claimant began screaming and yelling causing other incarcerated persons in their lines to stop and look back (*Id.*). He testified that Officer Ocasio said, "don't look – you keep going to the – to the group." (*Id.*). At that time, Officer Lassiter came running over from A block and Claimant testified that Officers Lassiter and Ocasio began beating him down to the floor (*Id.*). Claimant further testified that Officer Ocasio had his knee on Claimant's back and both officers handcuffed him and dragged him to the infirmary (*Id.*). Claimant testified that he did not resist in any way (T1. 31).

Claimant testified that once he reached the infirmary, he was placed in a room and seen by both a nurse and his mental health counselor (T1. 33). He stated that after the incident, he spoke with Sergeant Panzarella in Italian and told the Sergeant what had occurred (*Id.*). He testified that Sergeant Panzarella advised Claimant that he was going to be transported to the SHU under 24-hour suicide watch (T1. 33-35). Claimant further testified that after a disciplinary hearing was held, he was found guilty of assault on the staff and sentenced to six months in the SHU (T1. 35-37).

On cross-examination, Claimant testified that he lied to Officer Ocasio in order to get to commissary quickly and testified that "[y]es, at first I told him that I was from A [b]lock and then I said no, I'm from B [b]lock, and he told me to shut the fuck up and sit down." (T1. 42). He further testified that he filed a grievance following his disciplinary hearing and did not mention Officer

Lassiter therein (T1. 44, 48). Claimant testified that the Office of Special Investigation ("OSI") interviewed Claimant in relation to his grievance and found his allegations were unsubstantiated (T1. 49-50). He further testified that the injury sustained to his right hand, as well as his mental health diagnosis, predate his incarceration at Sing Sing CF (T1. 52-53).

*Lawrence Parker*

Lawrence Parker testified that he was incarcerated at Sing Sing CF from 2012 to 2018 (T2.[2] 65). He testified that he first met Claimant in 2012 when he arrived at Sing Sing CF (T2. 66). He testified that in October 2014 he worked as a porter at Sing Sing CF (T2. 65).

On the date of the incident, Mr. Parker testified that he was working as a porter, sweeping and mopping (T2. 68). He estimated that the incident involving Claimant took place at about 11:00 am (T2. 69). He testified that he knew the three correction officers involved in the incident (*Id.*). He said he observed Claimant being kicked, slapped, and punched in the face. (*Id.*). Mr. Parker testified that he heard one of the officers stating, "I'm going to kick your ass, white boy." (T2. 70).

Mr. Parker further testified that he saw Claimant with his hands on the wall, as he was being searched and instructed to get on the wall (*Id.*). He went on to testify that "one officer went in his cell. Two officers had him on the wall. They told him face the wall. He had his hand on the wall, and they was in a conversation. And then the next thing I know one of the officers punched him in the back of the head. His face hit the wall, bam. He turned around, and when he turned around that's when they start beating on him and kicking him." (*Id.*). During this time, Mr. Parker observed Claimant with his hands over his face, not fighting back, and that after about fifteen minutes, he was handcuffed and taken off the block (T2. 71).

On cross-examination, Mr. Parker testified that at the time of the incident, he lived in B

---

[2] "T2." shall refer to Trial Transcript Page of February 8, 2023, trial date.

block, on V Gallery, and was housed four cells away from Claimant (T2. 74). He testified that he played spades and chess with Claimant, and they went to recreation together (T2. 75-76).

### Defendant's Motion to Dismiss

Claimant rested and Defendant made a motion to dismiss Claimant's wrongful confinement cause of action. After oral argument, the Court granted Defendant's motion to dismiss Claimant's wrongful confinement cause of action and instructed the parties to proceed on Claimant's assault cause of action. Thereafter, Defendant proceeded to call its first witness.

### Correction Officer Antonio Ocasio, Jr.

Officer Ocasio testified that at the time of the incident, he had been a correction officer for the Department of Corrections and Community Service (DOCCS) for twenty-six and a half years, starting his career in September 1996 at Sing Sing CF (T2. 83). He testified that on the day of the incident, he was the Medical Escort Officer in the A block at Sing Sing CF (T2. 85). He further testified that as the Medical Escort Officer he "would escort the [incarcerated individuals] that had call-outs for blood work, [incarcerated individuals] that were in routinely every day for medications such as for diabetes, [and] other things." (T2. 85-86). On October 14, 2014, Officer Ocasio was working Tour 2, the 6:00 am to 2:00 pm day shift (T2. 86). He testified that he did not recall an incident with an incarcerated individual on the date of the incident, nor would anything refresh his recollection (Id.).

Officer Ocasio was shown a memorandum dated October 14, 2014, from Officer Ocasio to Sergeant Panzarella (Exhibit C) (hereinafter, the "Memorandum"), which stated the following:

> On the above date and approximate time of 1:35p.m. I was escorting a group of [incarcerated individuals] back from the facility E.R. when [incarcerated individual] Albanese, R 09A5144 requested to go to the commissary building. I denied his request and directed him to return back to his block and be escorted by his commissary escort. [Incarcerated individual] Albanese 09A 5144 then swung his right fist striking me in the right side of my face cheek area. I then struck [incarcerated individual] Albanese one time to his right cheek with a closed fist

FILED: NYS COURT OF CLAIMS 03/20/2024 10:39 AM

NYSCEF DOC. NO. 5

CLAIM NO. 126866

RECEIVED NYSCEF: 03/20/2024

Claim No. 126866

Page 6 of 12

using my right hand. [Incarcerated individual] Albanese then attempted to grab both of my shoulders using both of his hands. I then struck [incarcerated individual] Albanese one time behind his right ear with a closed fist using my right hand. I then grabbed [incarcerated individual] Albanese in bear hug type hold using both of my arms and applied downward pressure taking him to the floor. Then using my body weight, I pinned him to the floor. No further force was used. Then I was directed by [Sgt. Panzarella] to release my hold and report to the facility E.R. for medical assessment.

Officer Ocasio testified that "to/from" memoranda are used when instances of use of force occur, to request a day off/vacation, or to explain something (T2. 89). Officer Ocasio testified that during the entirety of his career, he has been interviewed by OSI approximately two times, which were deemed unsubstantiated. He testified that he has never had a grievance against him substantiated nor has he been docked or disciplined for misconduct (T2. 90). Officer Ocasio further testified that prior to the date of the alleged incident, he did not know Claimant and never had an interaction with Claimant (T2. 91).

On cross-examination, Officer Ocasio testified that he did not recall if he missed time from work because of the subject incident (T2. 91-92). He did not recall if Officer Lassiter was with him on October 14, 2014 (T2. 92). He further testified, after reviewing the Memorandum (*Exhibit C*), that he did not recall any details about the incident contained therein nor did he recall preparing the Memorandum (T2. 93-94). Officer Ocasio testified that he did not recall going to the infirmary after the incident nor going to Phelps Hospital thereafter (T2. 94-95). Officer Ocasio was shown *Exhibit F*, a Misbehavior Report dated October 14, 2014, and *Exhibit E*, an Unusual Incident Report dated October 14, 2014, neither of which refreshed his recollection of the details of the incident (T2. 96-99).

### Correction Officer Matthew Ruquet

Officer Ruquet testified that he has been employed by DOCCS as a correction officer at Sing Sing CF since August 2018 (T2. 105). He testified that he has been a Weapons Training

Officer since December 2021 (T2. 105-106), and his duties as a Weapons Training Officer include providing year-round trainings on use of force to all security officers on staff, including correction officers (*Id.*). He further testified that all correction officers receive annual training on use of force, including on the proper way to use force, when force is prohibited, and when force is permitted (T2. 107). He specifically testified that use of force is permitted "in self-defense, defense of a third party, or to protect property, to enforce compliance with the lawful direction, [to] quell a disturbance, or prevent an escape." (T2. 108).

Officer Ruquet testified that DOCCS policies and procedures permit a correction officer to strike an incarcerated individual to defend him or herself (T2. 109). He further testified that the use of force ends when mechanical restraints are applied, and "force is no longer necessary to… contain the situation and de-escalate the situation (T2. 110). Officer Ruquet testified that DOCCS policies and procedures make no distinction between the appropriate use of force and an incarcerated individual's age or size (T2. 111).

On cross-examination, Officer Ruquet testified that he has no personal knowledge of the incident involving Claimant, nor has he spoken to Claimant (T2. 116). He testified that DOCCS Directive 4944 requires correction officers to write use of force reports after they use force on an incarcerated individual (*Id.*).

### *Captain Mario Panzarella*

Captain Mario Panzarella testified that he has been employed by DOCCS since 2006, currently as a Captain, at Shawangunk Correctional Facility (T3[3]. 125). He testified that in October 2014, he worked as a Sergeant at Sing Sing CF (*Id.*), that his responsibilities as Sergeant were to manage the housing unit he was assigned to and the staff who worked the unit (*Id.*), and that he

---

[3] T3." shall refer to Trial Transcript Page of February 9, 2023, trial date.

[* 7]

worked the Tour Two shift from 7:00 am to 3:00 pm, assigned to A block (T3. 125-126). He testified that he and Claimant would speak in Italian from time to time and that they never had an altercation (T3. 126).

He testified that his first involvement in the incident was responding to the "area," "a small hallway that separates the main correctional facility from the medical unit." (T3. 127). Captain Panzarella responded within 10 or 15 seconds and observed Officer Ocasio laying on top of Claimant and directed Officer Ocasio to "let him go." (T3. 127-128). He directed Officer Lassiter to put Claimant in restraints and advised Officer Ocasio to report to medical to be assessed (*Id.*). Captain Panzarella then escorted Claimant to medical (T3. 129). He observed that Claimant had a mark on his head behind his ear but was not bleeding (*Id.*).

Captain Panzarella was then shown the Use of Force Report dated October 14, 2014, (*Exhibit G*) prepared by him and reviewed by Lieutenant Pinker, (T3. 130-131) in which he described the events leading up to the application of force as follows: "[incarcerated individual] Albanese 09A5144 swung his right hand and punched Officer Ocasio with a closed fist to the right side of his face cheek area." (*Id.*). Captain Panzarella recalled that after the incident, Claimant stated that he wanted to go to commissary, said "he was sorry," and asked Captain Panzarella "if [he] can make this whole thing go away" (T3. 132).

On cross-examination, Captain Panzarella testified that the incident happened between A block and the hospital clinic at Sing Sing CF (T3. 134). He testified that he could not see the area in which the incident occurred because it was "around the bend" (T3.134-135). He advised that he was aware of the 710 bypass gate and described it as being located on the inside of the facility and visible from A block (T3. 135-136). He further testified that when he was notified that the 710 personal alarm was pulled, which "gets transmitted to what we call central base and base will

[* 8]

notify the area of where that particular alarm has been activated." (T3. 136). Captain Panzarella testified that neither Officer Lassiter nor Officer Ocasio was the 710 officer on the day of the incident. (T3. 137).

Captain Panzarella was shown the Employee Accident/Injury Report dated October 14, 2014 (*Exhibit A*), which he testified is required to be filled out if an injury is sustained (T3. 142), and which describes the injuries sustained by Officer Ocasio during the incident with Claimant. He read the "findings" portion of the report which stated "bruise to R side of cheek just to the R eye & some swelling. Bruising & swelling of the R knuckles & very limited range of motion unable to write his own statement due to swelling of same hand." Captain Panzarella was then shown the Memorandum (*Exhibit C*) and testified that it was typed and usually prepared on the computer located in the administration part of the building (T3. 145). He was then shown *Exhibit D* and was asked whether the Memorandum was drafted on October 14, 2014, if Officer Ocasio was transported to the hospital after the incident, which occurred at 1:35pm, and his shift was over at 3:00pm (T3. 146-147). Captain Panzarella testified that although Officer Ocasio's tour of duty was over at 3:00pm, he was required to stay and complete all paperwork necessary, as long as he did not sustain any serious injury (T3. 147). Captain Panzarella also testified that Claimant made no complaints to him that Officer Lassiter had physically touched him and therefore, Officer Lassiter was not required to issue a use of force report (T3. 148-149).

On re-direct, Captain Panzarella clarified that in October 2014, an officer who applied mechanical restraints to a compliant incarcerated individual was not required to complete a use of force report or a "to/from" memorandum regarding the incident (T3. 149-150).

The defense then rested, the Court heard closing statements, and decision was reserved.

<u>**Law and Analysis**</u>

[* 9]

"Battery is the unjustified touching of another person, without that person's consent, with the intent to cause a bodily contact that a reasonable person would find offensive; '[a]ssault involves putting a person in fear of a battery' " (*Rivera v State of New York*, 34 NY3d 383, 389 [2019], quoting *Jeffreys v Griffin*, 1 NY3d 34, 41 n 2 [2003]; *see also Silipo v Wiley*, 138 AD3d 1178, 1182 [3d Dept 2016]; *Bastein v Sotto*, 299 AD2d 432, 433 [2d Dept 2002]). There is no requirement, however, that the contact be intended to cause harm (*see Relf v City of Troy*, 169 AD3d 1223, 1226 [3d Dept 2019]). In the prison environment, the use of force is specifically permitted "in self defense, or to suppress a revolt or insurrection [and] . . . to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape" (Correction Law § 137 [5]). As set forth in 7 NYCRR § 251-1.2 (b), "[w]here it is necessary to use physical force, only such degree of force as is reasonably required shall be used."

Assessment of the degree of necessary force requires consideration of the particular circumstances confronting officers at the time the force was applied (*see Diaz v State of New York*, 144 AD3d 1220, 1222 [3d Dept 2016]; *Koeiman v City of New York*, 36 AD3d 451 [1st Dept 2007], *lv denied* 8 NY3d 814 [2007]; *Bazil v State of New York*, 63 Misc 3d 1216 [A], *3 [Ct Cl 2019]). Only when the force used was "unreasonable or excessive under the circumstances or in violation of any policy or procedure of [the State]" may liability for assault and battery be imposed (*Bush v State of New York*, 57 AD3d 1066, 1066 [3d Dept 2008]). The State is not immune from liability for an assault and battery when an officer, acting within the scope of his or her employment, uses more force than is necessary to perform his or her duty (*see Arteaga v State of New York*, 72 NY2d 212, 220-221 [1988]; *Jones v State of New York*, 33 NY2d 275 [1973], *rearg dismissed* 55 NY2d 878 [1982]).

[* 10]

In situations involving an incarcerated individual's allegations of use of excessive force by a correction officer, such as here, the Claimant has the burden of proving his case by a preponderance of the credible evidence (*see Rinaldi & Sons v Wells Fargo Alarm Serv.*, 39 NY2d 191 [1976]; *Weinberger v New York State Olympic Regional Dev. Auth.*, 133 AD3d 1006 [3d Dept 2015]). Here, as in most such cases, in determining whether the use of force against Claimant was "'more than necessary under all the circumstances,' the court's assessment of the credibility of the testimony, and the extent to which the other evidence bears on that assessment of credibility, is crucial (*see Lewis v State of New York*, 223 AD2d 800 [3d Dept 1996]; *Davis v State of New York*, 203 AD2d 234 [2d Dept 1994]; *Hinton v City of New York*, 13 AD2d 475 [1st Dept 1961])." (*Davis v State of New York*, UID No. 2013-029-009 [Ct Cl, Mignano, J., Apr. 24, 2013]. Moreover, such assessment must be made with due consideration of the "'formidable tasks' of maintaining order and security in correctional facilities and protecting the safety of [incarcerated individuals] and employees." (*Arteaga v State of New York*, 72 NY2d at 217).

## DECISION

Based upon the credible testimony and evidence presented at trial, the Court finds that the use of force exerted by Officer Ocasio on Claimant was unreasonable and excessive given the circumstances. At trial, the Court heard no credible testimony regarding Claimant's alleged assault on Officer Ocasio. Although Defendant presented to/from memoranda and notwithstanding the disciplinary measures taken against Claimant, the Court is not convinced that Officer Ocasio was forthright then or at trial. At trial, Officer Ocasio had no independent recollection of the incident and the Court, therefore, does not credit his testimony.

With respect to the training given to correction officers, Officer Ruquet credibly testified that all officers receive annual training on use of force, including on the proper way to use force,

when force is prohibited, and when force is permitted. He specifically testified that use of force is permitted "in self-defense, defense of a third party, or to protect property, to enforce compliance with the lawful direction, [to] quell a disturbance, or prevent an escape."

It is this Court's opinion that Officer Ocasio either was unaware of the principles applicable to the use of force as set forth in the statute and regulations or he intentionally disregarded those principles when he punched Claimant with a closed fist in the head or when he laid on top of him until told to "get off of him". Here, there was no testimony that Officer Ocasio made any attempt to avoid the use of physical force or that the severity of force by him on Claimant was necessary and reasonable given the circumstances. It is this Court's opinion that even if Claimant did punch Officer Ocasio, there was no need for the additional use of force exerted on Claimant by Officer Ocasio, after Claimant was restrained.

The Court finds after consideration of all the evidence, that there was no justification for the excessive and unreasonable use of force against Claimant on the date in question, that no culpable conduct on Claimant's part contributed to the events and that Defendant must answer in damages.

Only motions not previously decided are hereby denied.

The Clerk of the Court is directed to enter interlocutory judgment in accordance herewith and a damages trial will be scheduled as soon as practicable.

Dated: February 23, 2024
      Hauppauge, New York

*Linda K. Mejias-Glover*

**LINDA K. MEJIAS-GLOVER,**
**Judge of the Court of Claims**

[* 12]